DEBRA HUMMEL *v.* MARTEN
TRANSPORT, LTD., ET AL.
(AC 28813)
(AC 30000)

Harper, Beach and Robinson, Js.

Argued January 8—officially released June 9, 2009

*William F. Gallagher*, with whom were *Erica W. Todd*, and, on the brief, *Hugh D. Hughes* and *Joseph F. Trotta*, for the appellants (defendants).

*Albert E. Desrosiers,* for the appellee (plaintiff).

HARPER, J. In this workers' compensation matter, the defendants, Marten Transport, Ltd. (Marten), and its insurer, Crawford & Company, appeal from the decisions of the workers' compensation review board (board) affirming the workers' compensation commissioner's (1) finding of compensability, (2) award of a penalty pursuant to General Statutes § 31-303 and (3) refusal to reduce the award to the plaintiff, Debra Hummel, by the amount of social security widow's benefits she receives. We affirm the decisions of the board.

The following facts and procedural history are relevant to the issues on appeal. The plaintiff filed a workers' compensation claim after her husband, Henry Hummel, was found dead in the sleeper cab of his employer's truck. On April 24, 2003, Darius J. Spain, workers' compensation commissioner for the fifth district, found the following facts. "The plaintiff's husband, Henry Hummel, was a cross-country driver of an eighteen wheel tractor trailer for Marten. He was found dead in the sleeper cab of his truck on November 25, 1997. He had returned home from a cross-country trip early in the afternoon of November 24, 1997, looking dirty, tired and agitated. He had a heated dispute with a Marten official over the telephone about whether he was entitled to be paid following an apparent problem with the paperwork that he had submitted earlier. The plaintiff testified that she had known her late husband for more than thirty years and had never seen him in such an agitated state. She feared he would have a heart attack. Following a shower and some rest, he left home between 10 p.m. and 11 p.m. He parked near his drop off point in Waterbury so that he could sleep and then drop off his load early the next morning. He died in the sleeper cab before morning.

"[Commissioner Spain] also found that Marten had urged Henry Hummel to drive as much as possible. He falsified his log books to hide from the transportation authorities the number of hours he drove. On the three week trip, completed shortly before his death, he had driven an average of 569 miles per day, and it was not unusual for him to drive 5000 miles in a week. He slept only two or three hours a day and never exercised. He did not eat a proper diet, nor did he eat on a regular schedule. He was a lifelong smoker and sometimes used cigars to wake himself up by burning his fingers when he fell asleep while driving. He was sixty-four years old at the time of his death.

"[Commissioner Spain] concluded that '[t]he stress of [Henry Hummel's] job and its limitations on his time for other activities was a substantial factor in the chain of events which led to [his] fatal ischemic heart disease.' [Commissioner Spain] accordingly ordered the payment of benefits pursuant to General Statutes § 31-306. . . .[1] [Commissioner Spain] did not determine the amount of benefits to be paid.

"The defendants appealed to the board, claiming that the plaintiff failed to prove within a reasonable degree of medical probability that her late husband's employment was a substantial factor in the cause of his death. The board reviewed all of the testimony, including that of two medical experts, and concluded that an adequate evidentiary basis existed for the commissioner's finding of compensability. The board did not issue a remand order from its decision despite the failure to determine the amount of the award. Thereafter, the defendants appealed to this court, raising the same sufficiency of the evidence claim." *Hummel* v. *Marten Transport,*

---

[1] General Statutes § 31-306 provides for the compensation of "dependents on account of death resulting from an accident arising out of and in the course of employment or from an occupational disease . . . ."

*Ltd.*, 90 Conn. App. 9, 10–12, 875 A.2d 575 (2005), aff'd, 282 Conn. 477, 923 A.2d 657 (2007). This court dismissed the defendants' appeal for lack of a final decision. Id., 12–15.

After the board affirmed the commissioner's finding of compensability, "the plaintiff . . . brought [a] separate proceeding to determine, among other things, the amount of benefits to be paid. In addition to the calculation of widow's benefits, the plaintiff sought an order pursuant to General Statutes § 31-301 (f) that the defendants pay her benefits pending . . . appeal and sought the imposition of penalties under General Statutes §§ 31-300 and 31-303." Id., 12–13. On November 18, 2003, following a formal hearing, Amado J. Vargas, workers' compensation commissioner for the fifth district, calculated the widow's benefits that the plaintiff was due under § 31-306, entered the § 31-301 (f) order and held open the issues of §§ 31-300 and 31-303 penalties. The defendants again appealed to the board, raising the issues of whether (1) the defendants would receive an offset under General Statutes (Rev. to 1997) § 31-307 (e) for social security old age insurance benefits that the defendants claimed the plaintiff had received[2] and (2) the entire award of benefits may be withheld on appeal because General Statutes § 31-301 (d) and (f), as read together, are contradictory and unconstitutional as a deprivation of property without due process. On November 19, 2004, the board remanded the case to the commissioner for further proceedings addressing

---

[2] General Statutes (Rev. to 1997) § 31-307 (e) provides for the offset of any social security old age insurance benefits against workers' compensation payments. Public Acts 2006, No. 06-84, removed subsection (e) from § 31-307.

We look to the statute in effect at the date of injury to determine the rights and obligations between the parties. See *Dos Santos* v. *F.D. Rich Construction Co.*, 233 Conn. 14, 15 n.1, 658 A.2d 83 (1995); *Civardi* v. *Norwich*, 231 Conn. 287, 293 n.8, 649 A.2d 523 (1994); *Iacomacci* v. *Trumbull*, 209 Conn. 219, 222, 550 A.2d 640 (1988).

the application of § 31-307 (e). The board held that § 31-301 (d) and (f) serve different purposes and that the issuance of a § 31-301 (f) order was proper.

On April 13, 2006, after a hearing, Michelle D. Truglia, workers' compensation commissioner for the fifth district, held that there was no statutory authority under § 31-307 (e) that would entitle the defendants to a setoff against widow's benefits awarded under § 31-306. In addition, Commissioner Truglia determined that the November 18, 2003 calculation of benefits created a legal obligation to pay.[3] The commissioner also found that the plaintiff was entitled to 10 percent interest, pursuant to General Statutes §§ 31-300 and 37-3a, on the unpaid portions of benefits. Furthermore, Commissioner Truglia found that the defendants wilfully had failed to pay the § 31-301 (f) award and ordered the defendants to pay the second injury fund $4500 pursuant to General Statutes §§ 31-288 (a) and 31-289. Finally, Commissioner Truglia found that the defendants had unduly delayed the payment of compensation in violation of § 31-288 (b) and ordered the payment of $9000 to the second injury fund pursuant to § 31-289. Commissioner Truglia left open the issue of attorney's fees under § 31-300 for future proceedings and also "exercised [her] discretion" not to award interest under § 31-303.

The defendants again appealed to the board, claiming that (1) § 31-307 (e) entitled them to offset § 31-306 benefits with any payments to the plaintiff of federal social security survivor benefits under 42 U.S.C. § 402 (e), (2) Commissioner Truglia improperly found that the defendants had unduly delayed the payment and (3) Commissioner Truglia improperly awarded the plaintiff

---

[3] Commissioner Truglia recalculated the benefits pursuant to General Statutes § 31-306 because the parties acknowledged that incorrect information was provided to determine the November 18, 2003 order. The parties stipulated to the correct compensation rate.

interest pursuant to § 31-300. The plaintiff appealed from Commissioner Truglia's failure to award a mandatory 20 percent penalty pursuant to § 31-303. On April 19, 2007, the board affirmed Commissioner Truglia's finding and award except her conclusion that the award of a penalty under § 31-303 is discretionary.

Commissioner Truglia, on November 13, 2007, found that under § 31-303, the plaintiff was due a 20 percent penalty for unpaid widow's benefits and statutory burial expenses.[4] In addition, Commissioner Truglia found that pursuant to § 31-300, the plaintiff's attorney was due $9300 in attorney's fees for his "extraordinary efforts" expended to collect benefits under § 31-301 (f).[5] The defendants again appealed to the board. On May 14, 2008, the board affirmed the commissioner's decision, holding that the §§ 31-300 and 31-303 awards of attorney's fees and statutory penalties were proper.

Thereafter, the defendants appealed to this court, claiming that (1) the workers' compensation commissioner improperly found that work-related stress was a substantial factor in Henry Hummel's death when no medical expert testified to that effect, (2) the board incorrectly held that the penalty pursuant to § 31-303 applied to nonpayment of an award pending appeal and (3) social security widow's benefits should be credited against workers' compensation benefits.

I

The defendants first claim that the commissioner improperly found that Henry Hummel's death was compensable. Specifically, the defendants claim that the

---

[4] The penalty amounted to $43,909.69 for the unpaid widow's benefits and $800 for the unpaid burial expense.

[5] The commissioner awarded attorney's fees for thirty-one hours at the rate of $300 per hour for attendance of the plaintiff's attorney at eight hearings and his handling of extensive correspondence. The purpose of the award was to sanction the defendants for their unreasonable conduct.

commissioner improperly found that the stress of Henry Hummel's job and its limitations on his time for other activities was a substantial factor in the chain of events that led to the decedent's fatal ischemic heart disease.[6] We disagree.

At the hearing before Commissioner Spain, the plaintiff testified as to the following facts. Henry Hummel was hired as a cross-country truck driver for Marten on August 4, 1994. His job was to drive across the United States and sometimes Canada with different freights, keeping him on the road every day of the week. Henry Hummel frequently complained about his employment with Marten. In the last year or two of his life, Henry

---

[6] The defendants claim that the commissioner improperly (1) relied on his inferences rather than medical testimony to decide that work stress was a substantial factor in Henry Hummel's death, (2) found that Henry Hummel's employment imposed limitations on his time for other activities and, thus, was a substantial factor in his death and (3) drew illogical and unreasonable inferences from the evidence.

The defendants ask us to retry the facts. It is not within our province as an appellate court to do so. "The commissioner has the power and duty, as the trier of fact, to determine the facts. . . . The conclusions drawn by him from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Chesler* v. *Derby*, 96 Conn. App. 207, 211, 899 A.2d 624, cert. denied, 280 Conn. 909, 907 A.2d 88 (2006).

The defendants also claim that the commissioner improperly deviated from the expert medical testimony because the commissioner's expert, Steven M. Horowitz, a physician, testified on the basis of exactly the evidence before the commissioner. The defendants ask us to apply a blanket rule that when a medical expert reviews factual deposition testimony and medical records prior to trial, the commissioner must not draw inferences from that expert's testimony. We need not address that assertion, however, because we note that two experts testified as to different and sometimes conflicting opinions and that factual testimony and exhibits were admitted for the commissioner's consideration. It is within the commissioner's province, not that of an expert witness, to determine the facts, both subordinate and inferential, and to determine the ultimate issue.

Accordingly, we will review the defendants' claims only to the extent that they have challenged the findings as being without evidentiary support or based on unreasonable or impermissible factual inferences.

Hummel's physical appearance changed; he went from having a clean appearance, with his hair cut and his face shaved, to having a dirty, unkempt appearance, with dirt in the cracks of his hands, long hair and a long beard. He also began wearing untied sneakers or work boots and carrying excess weight in his abdomen. In 1997, Henry Hummel did not take any vacations.

The plaintiff also testified that Marten paid Henry Hummel thirty-three cents per mile so that the more miles he drove, the more money he earned.[7] He habitually falsified his logs to drive more hours in a day than he was allowed under the regulations promulgated by the department of transportation. He received his assignments via computer from a dispatcher of Marten, allowing him to receive a new assignment as soon as he completed one. He would try to drive 5000 miles each week so that he could have enough money to support his family. He typically was away from home for up to three months at a time, and, even at home, he would wake several times during the night for coffee or a snack. His diet also was dictated by his long hours; he bought inexpensive instant foods that could be cooked quickly in his truck. The only exercise that Henry Hummel engaged in when he was on the road consisted of his getting out of his truck to walk to a dock or to a truck stop to take a shower or have a cup of coffee.

Furthermore, the plaintiff testified that her husband would often call and ask her what his pay was for the

---

[7] Also, the plaintiff testified that Marten did not pay Henry Hummel for actual miles traveled but on the basis of a predetermined number of miles between destinations. Therefore, if he had to drive more miles because of a detour, he would not be reimbursed for those miles. Additionally, if he was delayed by traffic and did not make a delivery on time, Marten would penalize him by not providing him with a new assignment for several days. Henry Hummel was frequently upset that he was penalized for things that were out of his control.

week, thinking that his pay would be good because of how hard he worked. The plaintiff frequently had to inform him that Marten took money out of his pay because of penalties for late deliveries, delays in paperwork for assignments and advances to cover expenses for cleaning the truck, fueling the truck and tolls. When that happened, he would become very upset and call the payroll department to dispute the amount of his pay. During the last two years of his life, Henry Hummel expressed dissatisfaction with his job almost every time that he called home.

The plaintiff also testified that Henry Hummel had begun to complain about pain and weakness in his legs. When the Hummels brought their son around the neighborhood on Halloween, Henry Hummel had to drive. In addition, during the summer of 1997, he had complained that he was feeling old and tired and could not walk or do the things that he used to do. In the year prior to his death, he could not even walk the length of the Hummels' street. On his last trip, he was having pain in his back and shoulder but attributed it to an incident when he slipped off of his truck. He told the plaintiff that he was tired of the road and that it was "killing him."

The plaintiff testified that Henry Hummel had been a cigarette smoker for many years but had switched to cigars approximately one year before his death. He would light a cigar and, to make sure he stayed awake while driving, would keep it in his hand so that it would burn down and burn his fingers.

The plaintiff also testified that on November 24, 1997, her husband arrived at their home in Seymour between 1 and 2 p.m. Henry Hummel parked his eighteen wheel tractor trailer on the street outside their home because it was loaded with hazardous materials, requiring him

to keep it within sight at all times.[8] When he arrived home that day, he was sick with a cold.[9] The plaintiff described him as "grubby looking. He hadn't been bathed. He was tired. He was agitated. It wasn't Henry."[10] He was upset in part because another truck driver had just been found after being dead by the side of the road for one week. Additionally, while home, he talked to his employer's dispatcher and a payroll employee. He had an argument about not receiving his pay that week. Henry Hummel was upset because he could not get his paycheck to buy groceries for Thanksgiving dinner. He began swearing at the payroll employee, which the plaintiff noticed because it was out of character for her husband to use the "f word" in front of other people. After the argument, he was shaking and crying because he was tired of dealing with his job conditions and could not wait until retirement. The plaintiff tried to calm down Henry Hummel and told him that if he did not calm down, he could have a heart attack. In the thirty-one years she had known Henry Hummel, he was in the worst condition in which the plaintiff had ever seen him.[11] He eventually began

---

[8] The truck was ticketed for being parked on the street on November 24, 1997.

[9] The plaintiff testified that Henry Hummel would often be sick throughout the year because of the extreme climate changes that he was exposed to while driving from state to state. He would not come home or take time off because he did not think he could afford to do that. Despite his having a history of heart and vascular problems, He had not seen a physician in almost ten years.

[10] The plaintiff testified that Henry Hummel was a "happy go lucky" person when he was home with his family and friends. She testified that when their daughter accidentally drove a truck over a boulder, her husband just said: "Oh, well, Boots, it can be fixed." She testified that on Halloween that year, Henry Hummel was the "happy go lucky man that the kids and [she] knew and everybody knew. On [November] 24, he was a Henry that [she] had never seen before. . . . He wasn't happy. Henry always had a smile. Henry never used vulgarity in front of me or anyone, especially another female in the room. He would never use any type of vulgarity he used that day. He never swore in front of my children."

[11] The following day, an administrator at the school attended by the Hummels' daughter called the Hummel home to report that the Hummels' daugh-

to calm down; he spent some time with the Hummels' son, took a shower and lay down to try to sleep. Most of the time that he was home, however, he continued to talk about different problems at work.

Finally, the plaintiff testified that Henry Hummel left home at approximately 11 p.m. so that he could unload his truck early the next morning in Waterbury, pick up a short run and still be home in time for Thanksgiving with the plaintiff and their children. He had to stay with his truck overnight because of the hazardous materials with which it was loaded.

Police reports were admitted into evidence and showed that Henry Hummel was found dead in his tractor trailer on November 25, 1997. He was found cyanotic in the rear bunk of his cab. A witness observed the tractor trailer idling, seemingly unoccupied, from 3 a.m. on November 25, 1997. An autopsy report was admitted into evidence and established that the cause of Henry Hummel's death was ischemic heart disease.

Steven M. Horowitz, a physician, testified as an expert on the basis of his review of the plaintiff's deposition testimony and the report of the defendants' medical expert, James F. Flint, also a physician. Horowitz testified as to the following facts. Henry Hummel had vascular disease. He underwent an operation to his legs to treat claudication and treatment for heart disease in 1987. He did not take care of himself very well and was under constant stress to support his family. He experienced significant stresses as a truck driver. He had underlying cardiovascular disease with a significant degree of stenosis of two coronary arteries and significant atherosclerotic buildup. It is reasonably medically probable that chronic stresses play a role in the deposition of plaque in the cardiovascular system. Henry Hummel was under significant chronic stress because of

ter was upset and skipping classes because she was worried after seeing her father so upset.

the rigors of truck driving and died as a result of his underlying cardiovascular disease, which was caused or contributed to by his plaque buildup.[12]

Horowitz also testified that stress causes changes in the hormone system, which in turn cause elevated blood pressure and the constriction of blood vessels. Elevated blood pressure and constricted blood vessels stress the internal lining of blood vessels and can injure the internal lining, creating a chain of events that leads to the deposition of plaque. Stress plays some role in changing the vascular state of a person, and, in certain circumstances, that role may be substantial. An acute stressful situation ordinarily increases the risk of a heart attack within the first three to six hours but may lead to unstable anginal conditions that cause or lead to a heart attack.[13] In addition, Henry Hummel's compro-

[12] The following colloquy occurred during direct examination of Horowitz by the plaintiff's counsel:

"Q. You accept that Mr. Hummel was under some chronic stress, significant, chronic stress occasioned by his truck driving in the rigors of that occupation?

"A. Apparently so, by description.

"Q. You also accept that he died in a large measure, a substantial measure, as a result of his underlying cardiovascular disease, which was caused or contributed to by his plaque buildup?

"A. Yes, I believe that is what killed him.

"Q. Therefore, his truck driving played a role in that, however great or small, played a role in the plaque buildup?

"A. That's speculation, it is possible.

"Q. You accepted that, though, that stress—

"A. Yes, I did.

"Q. You accept that, although it might be argued among comparable experts?

"A. Yes.

"Q. I believe that at one point you accepted that based upon reasonable medical probability?

"A. Yes."

[13] During direct examination by the plaintiff's counsel, Horowitz testified:

"Q. Assuming that there was testimony in this case that the day prior to his death, when Mr. Hummel came home, he was very agitated by virtue of a telephone conversation with his employer, the payroll department and

mised vascular condition would make it easier for acute stress to "push him over the edge" and cause sudden

the dispatch department to the point where he became very excited and upset, agitated and was shaking; would that in your opinion be an acute stressor that could precipitate a chain of events?

"A. The time frame was twenty-four hours?

"Q. I am not sure when he died, the exact time of his death. He died in his truck.

"A. Ordinarily, the risk after an acute stress is somewhere within the first three to six hours.

"Q. You also thought that the heart attack, if he had [a myocardial infarction], could have been evolving for some time prior to his death?

"A. I don't know that I said that. What I think I said was that there was evidence from his wife's testimony that he had been having symptoms, for days or weeks, perhaps, prior to his death, that he either was not aware were from his heart or just ignored. She talked about him having progressive difficulty mowing his lawn, for instance, having left arm pains which he thought were because of orthopedic problems. Those may have been manifestations of progressive heart disease.

"I don't know what the time frame of the heart attack would have been. It could have been within—if he had an acute arrhythmia on base of a heart attack it may well have been within the first fifteen to thirty minutes of the onset of the heart attack.

"Q. Heart attacks take time to evolve, you may have some vasoconstriction, angina and plaque rupture, partial occlusion which goes to full occlusion and then a cascade of events that lead to death. It takes time—

"A. Yes, but we believe that can occur over a very short period of time.

"Q. Can it occur over a longer period of time also?

"A. We certainly see people who have unstable anginal conditions which kind of start and stop over hours to a couple of days.

"Q. Unstable angina can degrade into more serious things?

"A. Left alone, it can cause a heart attack or it can lead to a heart attack.

"Q. That could be over a period of hours or days?

"A. It can.

"Q. The situation I described—it could be such a type of acute emotional event that can precipitate some sequelae?

"A. I don't think I'm disagreeing about that. I am just talking the time frame in which I would expect that to occur. . . . If you are asking me whether an acute event might have caused him to develop unstable angina and eventually lead to a [myocardial infarction], that conceivably could occur.

"Q. You can't rule that out?

"A. Nor in.

"Q. You don't know one way or the other?

"A. That's correct."

death.[14] Horowitz testified that it was "most likely" that Henry Hummel had ischemic cardiomyopathy that further compromised his ability to oxygenate his cells, and that it was a "reasonable medical hypothesis," "based on reasonable medical probability," that an acute stressful situation could have caused Henry Hummel to develop angina and suffer a myocardial infarction, resulting in sudden death.[15] Horowitz added that it was

[14] Horowitz also testified on direct examination:

"Q. So, if he had a pristine cardiovascular system, the degree of stress that he was subjected to would probably have minimal or no effect whereas in a man as compromised as Mr. Hummel it is a different story?

"A. Yes.

"Q. It takes less to push him over the edge?

"A. Yes.

"Q. You do have, if in fact you accept the hypothesis that either acute or chronic stress was a precipitant of the cascade of events, the catecholamine release, the vasoconstriction and other phenomena that lead to the cardiac event that was done in combination with a severe underlying coronary artery disease, combination of both factors?

"A. Yes.

"Q. And you can state that based on a reasonable medical probability?

"A. Yes."

[15] Specifically, Horowitz testified on direct examination:

"Q. You did repeat in your deposition that an acute stressful situation could have tipped him over the edge, could have precipitated—

"A. Yes.

"Q. You did say you would agree that if Mr. Hummel did have an acute stress with his underlying heart disease that might have prompted an acute decompensation?

"A. That's possible.

"Q. That's what you believed when you testified last time?

"A. Yes.

"Q. You still believe that?

"A. Yes.

"Q. What do you mean by an acute decompensation?

"A. He could have developed angina, he could have gone on to have a myocardial infarction.

"Q. And sudden death?

"A. And sudden death.

"Q. That's a reasonable medical hypothesis?

* * *

"A. I believe your hypothesis is: 'Could an acute stressful event have caused a sudden death?' And the answer to that is yes.

"Q. That answer is based on reasonable medical probability?

"A. Yes."

his opinion, based on a reasonable medical probability, that "[i]f the time frame were correct . . . an acute stressful situation could have led to a decompensation in someone who has an ischemic heart problem and cause either unstable anginal condition or possibly an acute myocardial infarction and the possibility of death." Horowitz stated, however, that he knew about Henry Hummel's underlying cardiovascular status from reading Flint's report and that he had an "inkling" of the underlying mental stress from the plaintiff's deposition testimony but that he had no knowledge of the events of November 24, 1997. Horowitz opined that he would be more comfortable with the time line if Henry Hummel had been able to testify that he suffered some symptoms on November 24, 1997, but with the facts he had, he couldn't "know for sure whether the acute episode" was related.

Horowitz also testified that being a truck driver is inherently dangerous and may cause heart attacks because of stress, loneliness, sleep deprivation, unhealthy diet and insufficient exercise and activity.[16] Horowitz also testified that Henry Hummel's poor diet,

[16] Horowitz testified as follows on cross-examination:

"Q. Doctor, is there anything about being a truck driver that is unique or inherently dangerous that would cause heart attacks?

"A. Yes.

"Q. What is that?

"A. There have been some studies done in the Scandinavian nations showing that truck drivers and bus drivers have a significantly increased incidence of cardiac risk, of having fatal heart attacks.

"Q. Is there an explanation as to why that takes place?

"A. There are numerous explanations. Some because of stress, some because of loneliness, some because of the types of lives they lead on the road without enough sleep, with poor food, without enough exercise and activity.

"Q. Doctor, in your opinion, did this man die because he was a truck driver?

"A. I don't think he died because he was a truck driver. But I think that being a truck driver may have added to his risks for finally having him die of heart disease."

smoking, sleep deprivation and stress affected his vascular disease.[17] Horowitz testified that he reviewed a literature search because he was not an expert on whether truck drivers were at an increased risk of heart disease. The research revealed that there were a number of studies that discovered an increased risk of fatal coronary disease in commercial drivers and that the authors suggested that the causes may be the constant stress of driving and the attendant isolation, lack of sleep and other lifestyle characteristics that Henry Hummel demonstrated.[18] Horowitz stated that "[t]here is a correlation and that is about all we should be saying," but conceded that some of the studies attributed the increased risk of fatal coronary disease to the lifestyle involved in commercial driving.

Flint testified that he reviewed Henry Hummel's medical records, a police report, the plaintiff's deposition and some abstracts from medical research articles.[19] Flint stated that the records revealed that Henry Hummel suffered from chronic atherosclerosis. Flint opined that Henry Hummel experienced sudden death most likely due to an arrhythmia, caused either by a heart attack or severe coronary insufficiency. Flint stated that Henry Hummel had severe and extensive vascular disease, which had progressed from a heart attack in the late 1980s to the condition that caused his death. Flint testified that the majority of heart attacks occur at rest, brought on by a sudden plaque rupture in an

---

[17] Horowitz testified, however, that Henry Hummel may have had other risk factors that were unknown because of his lack of medical care.

[18] Horowitz stated that it may be that there are more "type A" personalities among truck drivers, causing them to work harder and suffer more "psychic pressure" because of their working situation. He conceded, however, that the cardiologic literature now discounts being a "type A" personality as a risk factor for heart disease, and that, in any event, personality type is believed to be controlled by an underlying genetic disposition.

[19] The research abstracts were from Horowitz' research into the incidence of coronary disease in commercial drivers.

artery. Flint testified that stress is "probably one of the risk factors that predisposes to vascular disease." He continued, however, stating that it was not a primary or major role and not as potent as other risk factors such as diabetes, hyperlipidemia, hypertension and smoking. Flint testified that he did not think that Henry Hummel's work as a truck driver was the "per se" cause of his death. He explained that every occupation is stressful, so it was "kind of part of the ambient background, I think, of the way we live." Flint testified that it was a reasonable medical probability that Henry Hummel's death was a natural progression of his extensive vascular disease. Furthermore, he testified that Henry Hummel had other major contributing factors that led to his atherosclerosis, including his smoking, irregular diet, preexisting vascular disease and lack of medical care. Flint conceded, however, that atherosclerosis may be caused by more than one significant risk factor.[20]

---

[20] The following exchange occurred between the plaintiff's counsel and Flint:

"Q. Although Mr. Hummel might have died from a cardiac event at some other time and place under some other circumstances, isn't it probable and likely that the stress of his occupation and the effects on his vascular system accelerated the time of his death?

"A. Well, I think that from my reading of the deposition of the whole case, he experienced a great deal of stress and a lot of it had to do with meeting his financial obligations, and in order to do that he had to work long hours and working long hours was certainly stressful. So, it was kind of the totality of the existence [that] was stressful to him.

"Q. Which could have accelerated the timing of his—

"A. Which would contribute to the progression of his disease and ultimately his demise.

"Q. And that was a substantial contributing factor?

"A. Well, it's very difficult to quantify that. It was a contributing factor.

"Q. Of some significance?

"A. Well, it's of some significance, but it's impossible—you can't really quantify it. I would not regard it as of the same level of significance as his smoking and general lifestyle and the physiology with which he was born, probably.

"Q. Which you could have more than one significant risk factor, can you not?

"A. You can."

Flint testified on cross-examination that he had reviewed the plaintiff's deposition testimony but could not recall how many miles Henry Hummel drove on average. Flint suggested that it was "maybe 1000. I don't remember exactly, though." The following exchange occurred between the plaintiff's counsel and Flint:

"Q. Okay. You don't recall testimony [of] his driving 5000 miles a week on average?

"A. Five thousand miles a week? No, I don't remember that.

"Q. Would you find that incredible if he drove 5000 miles a week or 3500 miles a week?

"A. Yeah, I would find 5000 miles a week incredible.

"Q. That might change your opinion as to the relative degree of impact that his truck driving had on his general status? If he drove 5000 miles a week?

"A. Well, I would wonder if it would be physically possible to drive that many miles in a truck.

"Q. But if he did or approached that, it would certainly take its toll physically, would it not?

"A. That would probably be over 100 hours a week of continuous driving, if not more. That would be exhausting.

"Q. That would be what?

"A. Exhausting.

"Q. Okay. And it would have physiological sequelae of that type of regiment, wouldn't it?

"A. Well, I think working, you know, the longer one works, the more—more tiring it is, yes.

"Q. Okay. And you knew he was under a compulsion to put on miles in order to be paid?

"A. Yes.

"Q. Because he was paid by the mile?

"A. Yes. Yeah. I understand that."

Flint also testified that plaque rupture caused by a sudden emotional or physical stress is one theory, but that it is not really accepted by cardiovascular experts as unequivocally the only sequence of events leading to plaque rupture. He also testified that "if you have a really severe stress, that can precipitate a heart attack, but it typically occurs during the stress, not hours later." Flint also testified that the "probability is low that having an argument in the afternoon is directly responsible for dying the next morning."

Flint testified that chronic stress is a contributing factor in the progression of vascular disease and the development of atherosclerosis. He testified that stress was not considered to be a major determinant in the progression of atherosclerosis but conceded that "it's also very difficult to quantify stress." He added that stress is subjective and that some people tolerate external pressure better than others. Flint testified that the long hours of hard work that Henry Hummel put in were very stressful and exhausting. Flint testified that, on the basis of a reasonable medical probability, chronic stress itself is a contributing factor to the development and progression of atherosclerosis.[21] He also

---

[21] The following colloquy occurred between the plaintiff's counsel and Flint:

"Q. There may have been other risk factors, whether its hyperlipidemia or hypercholesterolemia or smoking, which are also coronary risk factors which played a part, but in the context that I asked you—as a truck driver, creating chronic stress is also a significant factor in the plaque deposition creating atherosclerosis?

"A. Well, I think that just the general stress under which he existed was a contributing factor, but I don't think that it's the dominant factor at all.

"Q. But it was also an important factor to be considered with other factors?

"A. Yes. I think the other aspects of his physiology were more important in the development and progression of the atherosclerosis. It is a contributing factor, stress is.

testified that one article demonstrated a physiological connection between stressful times of driving and an increased catecholamine response, and the attendant rise in heart rate, blood pressure and the risk of vascular damage. Flint testified that, after reading the abstracts, his "take on [the studies was] that truck driving is an occupation that can be more stressful than some other occupations and that there may be a higher incidence of heart attacks amongst truck drivers, although [he was] not sure . . . what . . . other occupation [it was compared to]."

Finally, the plaintiff introduced an offer of personal property insurance from Marten to its employees, stating: "Today's professional trucker knows that keeping his vehicle moving means more money in the bank. Since this requires more time on the road, we know that you strive for as much comfort as possible. Televisions, VCR's, microwaves and other electronics are no longer luxury items and are appearing more and more in trucker's cabs . . . ."

We begin with the well established standard of review in workers' compensation appeals. "The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . Neither the . . . board nor this court has the power to retry facts. . . . [O]n review of the commissioner's findings, the [review board] does not retry the facts nor hear evidence. It considers no evidence other than that certified to it by the commissioner, and then for the

---

"Q. But stress is also a substantial contributing factor along with other factors in the deposition of plaque creating atherosclerosis?

"A. Well, it is a contributing factor, but it's not the dominant thing.

"Q. But it's also important?

"A. Yes, it's important, as [are] a lot of other things."

limited purpose of determining whether or not the finding should be corrected, or whether there was any evidence to support in law the conclusions reached. It cannot review the conclusions of the commissioner when these depend upon the weight of the evidence and the credibility of witnesses. . . . The finding of the commissioner cannot be changed unless the record discloses that the finding includes facts found without evidence or fails to include material facts which are admitted or undisputed. . . . It [is] the commissioner's function to find the facts and determine the credibility of witnesses . . . .

"It is an axiom of [workers'] compensation law that awards are determined by a two-part test. The [claimant] has the burden of proving that the injury claimed arose out of the employment and occurred in the course of the employment. There must be a conjunction of [these] two requirements . . . to permit compensation. . . . An injury is said to arise out of the employment when (a) it occurs in the course of the employment and (b) [it] is the result of a risk involved in the employment or incident to it or to the conditions under which it was required to be performed. . . . [C]ases have held that an injury [occurs] in the course of the employment when it takes place (a) within the period of the employment, (b) at a place where the employee may reasonably be and (c) while he is reasonably fulfilling the duties of the employment or doing something incidental to it. . . . There must be a conjunction of [these] two requirements [of the test] . . . to permit compensation. . . . The former requirement [of arising out of the employment] relates to the origin and cause of the accident, while the latter requirement [of occurring in the course of employment] relates to the time, place and [circumstance] of the accident. . . . Whether an injury arose out of and in the course of employment is

a question of fact to be determined by the commissioner. . . . If supported by competent evidence and not inconsistent with the law, the commissioner's inference that an injury did or did not arise out of and in the course of employment is, thus, conclusive." (Citations omitted; internal quotation marks omitted.) *Mleczko* v. *Haynes Construction Co.*, 111 Conn. App. 744, 747–49, 960 A.2d 582 (2008).

"[I]t bears remembering that a commissioner's [finding] that an injury did not arise out of [or occur in the course of] employment is a finding of fact. As such, it may be reversed only if it is not supported by the evidence or is inconsistent with the law." (Internal quotation marks omitted.) Id., 751. In the present case, the defendants challenge only the commissioner's findings with regard to whether Henry Hummel's death arose out of his employment with Marten. "[T]raditional concepts of proximate cause furnish the appropriate analysis for determining causation in workers' compensation cases. . . . [T]he test for determining whether particular conduct is the proximate cause of an injury [is] whether it was a substantial factor in producing the result. . . .

"Our role is to determine whether the [board's] decision results from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . This standard clearly applies to conflicting expert medical testimony. It [is] the province of the commissioner to accept the evidence which impress[es] him as being credible and the more weighty. . . .

"As long as it is clear that the expert's opinion was based on more than mere conjecture, the entire substance of the expert's testimony should be examined. . . . [E]xpert opinions must be based on reasonable probabilities rather than mere speculation or conjecture

if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. An expert's testimony as to the reasonable probability of the occurrence of an event does not depend on semantics or the use of any particular term or phrase, but rather, is determined by looking at the entire substance of the testimony. . . . The [commissioner] alone is charged with the duty of initially selecting the inference which seems most reasonable and his choice, if otherwise sustainable, may not be disturbed by a reviewing court. . . . Inferences may only be drawn from competent evidence. Competent evidence does not mean any evidence at all. It means evidence on which the trier properly can rely and from which it may draw reasonable inferences." (Citations omitted; internal quotation marks omitted.) *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, 99 Conn. App. 336, 342–43, 913 A.2d 483, cert. granted on other grounds, 281 Conn. 929, 918 A.2d 277 (2007).

"Compensation . . . is not to be denied because the injury would not have occurred except for the peculiar susceptibility of the individual worker. . . . The employer of labor takes his workman as he finds him and compensation does not depend upon his freedom from liability to injury through a constitutional weakness or latent tendency. Whatever predisposing physical condition may exist, if the employment is the immediate occasion of the injury, it arises out of the employment because it develops within it." (Citation omitted; internal quotation marks omitted.) *Triano* v. *United States Rubber Co.*, 144 Conn. 393, 398, 132 A.2d 570 (1957).

The defendants claim that the commissioner improperly found that the stress of Henry Hummel's job and its limitations on his time for other activities was a substantial factor in the chain of events that led to the decedent's fatal ischemic heart disease. The defendants

claim that the commissioner's finding was an illogical and unreasonable inference from the evidence. We disagree.

Considering the entire substance of the experts' testimony along with the plaintiff's testimony and exhibits, we cannot say that the commissioner's finding resulted from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. The commissioner was free to determine in the first instance which inferences seemed most reasonable. The evidence supported the finding with a reasonable medical probability that the stress of Henry Hummel's job and its limitations on his time for other activities was a substantial factor in the chain of events that precipitated his fatal ischemic heart disease. Accordingly, we conclude that the board properly affirmed the commissioner's findings to that effect.

II

The defendants' second claim is that § 31-303 does not provide for the payment of a 20 percent penalty when nonpayment of an award pursuant to § 31-301 (f) occurs pending appeal.[22] Specifically, the defendants

[22] The defendants also claim that General Statutes § 31-301c (b) provides the appropriate penalty for failed appeals and that the legislature did not intend for both statutes to apply to awards on appeal. Although the defendants refer in their brief to General Statutes § 31-301 (c), it is clear that they rely on § 31-301c (b), which provides: "Whenever an employer or his insurer appeals a commissioner's award, and upon completion of the appeal process the employer or insurer loses such appeal, the Compensation Review Board or the Appellate Court, as the case may be, shall add interest on the amount of such award affirmed on appeal and not paid to the claimant during the pendency of such appeal, from the date of the original award to the date of the final appeal decision, at the rate prescribed in section 37-3a."

The defendants' claim, however, disregards the legislature's direction that the penalty provided for by General Statutes § 31-303 applies "in addition to any other interest or penalty imposed pursuant to the provisions of [the Workers' Compensation Act, General Statutes § 31-275 et seq.]." General Statutes § 31-303; see also *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 121 n.13, 942 A.2d 396 (2008) (§ 31-303 imposed 20 percent penalty in addition to existing remedy under General Statutes § 31-300).

argue that § 31-301 (f) mandates payment "under the terms of the award" and does not refer to amounts that are "due" under an award, as required by § 31-303.[23] We disagree.

We begin with our well settled standard of review. "The interpretation of a statute presents a question of law that is subject to plenary review. We consider the board's construction of a [workers'] compensation statute, but we give that construction no special deference unless an appellate court has reviewed the board's interpretation of the statute." *Rutledge* v. *State*, 63 Conn. App. 370, 380, 776 A.2d 477 (2001).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning [General Statutes] § 1-2z directs us first to consider the *text of the statute itself and its relationship to other statutes*. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Emphasis added; internal quotation marks omitted.)

---

[23] The defendants argue that the legislative history of the workers' compensation statutes confirms their proposed interpretation. Because we conclude that General Statutes §§ 31-301 (f) and 31-303 are unambiguous, we need not look further than the statutes' plain meaning.

*Urich* v. *Fish*, 112 Conn. App. 837, 841, 965 A.2d 567 (2009).

In considering the meaning of a provision of the Workers' Compensation Act (act), General Statutes § 31-275 et seq., we must be mindful of the act's remedial purpose. *Evanuska* v. *Danbury*, 285 Conn. 348, 357, 939 A.2d 1174 (2008). Our Supreme Court repeatedly has stated that the act "is to be construed with sufficient liberality to carry into effect the beneficent purpose contemplated in that legislation, and not to defeat that purpose by narrow and technical definition." (Internal quotation marks omitted.) *Muldoon* v. *Homestead Insulation Co.*, 231 Conn. 469, 483, 650 A.2d 1240 (1994).

Section 31-301 (f) provides for the payment of an award of compensation pending appeal. "During the pendency of any appeal of an award made pursuant to this chapter, the claimant shall receive all compensation and medical treatment payable under the terms of the award to the extent the compensation and medical treatment are not being paid by any health insurer or by any insurer or employer who has been ordered, pursuant to the provisions of subsection (a) of this section, to pay a portion of the award. The compensation and medical treatment shall be paid by the employer or its insurer." General Statutes § 31-301 (f).

Section 31-303 provides a penalty for late payment of workers' compensation awards. It provides in relevant part: "Payments due under an award shall commence on or before the twentieth day from the date of such award. . . . Any employer who fails to pay within the prescribed time limitations of this section shall pay a penalty for each late payment, in the amount of twenty per cent of such payment, in addition to any other interest or penalty imposed pursuant to the provisions of this chapter." General Statutes § 31-303.

The defendants claim that a 20 percent penalty under § 31-303 can be applied only to the nonpayment of uncontested awards. The defendants argue that the penalty applied by § 31-303 to "[p]ayments due under an award" does not apply to "compensation . . . payable under the terms of the award" as specified by § 31-301 (f). Instead, the defendants argue, the terms in §§ 31-301 (f) and 31-303 are ambiguous and require resort to the legislative history for a determination of their meaning. The defendants argue that to hold otherwise would make the twenty day grace period in § 31-303 "surplusage." We disagree.

The board determined that the plain meaning of § 31-301 (f) provides no alternative to the payment of an award during the pendency of an appeal if the claimant seeks payment. Although the board's interpretation of the statute is not entitled to deference, we nonetheless determine that its conclusion is correct. We can discern no ambiguity in § 31-301 (f); it clearly directs payment to a claimant "[d]uring the pendency of any appeal of an award made pursuant to [the act] . . . ." General Statutes § 31-301 (f).

Additionally, § 31-303 is not ambiguous. The statute clearly provides that payments must commence on or before the twentieth day from the date of an award. When read together with § 31-301 (f) and (g),[24] and in the absence of any statutory language to the contrary, we can only interpret the statute as requiring payment within twenty days of an order pursuant to § 31-301 (f) or the imposition of a 20 percent late fee. This interpretation is in line with the act's remedial nature. "The purpose of the act is to compensate workers [and their dependents] for injuries arising out of and in the course

[24] General Statutes § 31-301 (g) provides a method for recovery of compensation paid, with interest, on a claim pursuant to § 31-301 (f) in the event that the final adjudication results in the denial of compensation.

of employment, without regard to fault, by imposing a form of strict liability on employers. . . . Under the act, an employee compromises his right to a common-law tort action against his employer for work-related injuries in exchange for relatively quick and certain compensation." (Citations omitted.) *Szczapa* v. *United Parcel Service, Inc.*, 56 Conn. App. 325, 328, 743 A.2d 622, cert. denied, 252 Conn. 951, 748 A.2d 299 (2000). Any interpretation of § 31-303 including an indefinite grace period for contested awards only rewards employers for continuing to contest liability. In the present case, the defendants were first ordered to pay the plaintiff on November 18, 2003. The defendants' continuing refusal to compensate the plaintiff for the compensable death of her husband in 1997 is plainly the type of behavior that § 31-303, by its terms, should prevent.

## III

Finally, the defendants claim that § 31-307 (e) must be construed to allow them a setoff for social security widow's benefits. Specifically, the defendants argue that they are entitled to a setoff because Henry Hummel was planning on retiring when he became sixty-five years old, which would have occurred approximately ten months after his death, and § 31-307 (e) explicitly permits an offset against old age benefits.[25] We disagree.

[25] The defendants also argue that Connecticut's public policy forbids a double recovery when workers' compensation benefits are involved. The defendants refer to *Ancona* v. *Norwalk*, 217 Conn. 50, 584 A.2d 454 (1991), *Enquist* v. *General Datacom*, 218 Conn. 19, 587 A.2d 1029 (1991), and *Middletown* v. *Local 1073*, 1 Conn. App. 58, 62–63, 467 A.2d 1258 (1983), cert. dismissed, 192 Conn. 803, 471 A.2d 244 (1984), as evidence of the public policy against double recovery. We are not persuaded. A review of those cases shows only that we have (1) not permitted the simultaneous recovery of widow's benefits and of workers' compensation benefits by the widow, (2) permitted the setoff of workers' compensation benefits against the workers' recovery from third party tortfeasors and (3) not permitted recovery under both workers' compensation benefits and town survivorship benefits when a town ordinance requires a setoff. We cannot conclude that there is a

The defendants requested that the commissioner allow an offset of the workers' compensation benefits for any social security widow's benefits that the plaintiff was receiving. The commissioner found that there was no statutory authority under § 31-307 (e) that would entitle the defendants to a setoff from widow's benefits awarded under § 31-306. On appeal, the board considered the defendants' claim de novo. The board conducted an analysis of the text of § 31-307 (e) and determined that the defendants were not entitled to a setoff. The defendants also failed to persuade the board that the general policy against allowing a claimant a double recovery would be violated by the plaintiff's full recovery of her award.

The defendants have presented us with a question of law to which we afford plenary review. See *Rutledge* v. *State*, supra, 63 Conn. App. 380. We must determine whether the meaning of § 31-307 (e) is plain and unambiguous and whether the result in this case shows the statute to be unworkable. See *Urich* v. *Fish*, supra, 112 Conn. App. 841.

General Statutes (Rev. to 1997) § 31-307 (e) provides: "Notwithstanding any provision of the general statutes to the contrary, compensation paid to an employee for an employee's total incapacity shall be reduced while the employee is entitled to receive old age insurance benefits pursuant to the federal Social Security Act. The amount of each reduced workers' compensation payment shall equal the excess, if any, of the workers' compensation payment over the old age insurance benefits."

After a thorough review, we must conclude that the board's well reasoned decision, denying the defendants a setoff, is sound. The plain meaning of § 31-307 (e)

public policy that permits an employer to set off compensation benefits against any recovery of an injured worker or dependent from any source.

shows it to be inapplicable to the plaintiff's simultaneous collection of § 31-306 widow's benefits and social security widow's benefits. We do not find this result—that dependent survivors may recover more than incapacitated workers—absurd or unworkable. Rather, we, like our Supreme Court, must conclude that our legislature chose to restrict the setoff to a particular circumstance. See *Rayhall* v. *Akim Co.*, 263 Conn. 328, 347, 819 A.2d 803 (2003). Accordingly, the defendants' request for a setoff was properly denied.

The decisions of the workers' compensation review board are affirmed.

In this opinion the other judges concurred.