EVANA DINUZZO *v.* DAN PERKINS CHEVROLET GEO, INC., ET AL.
(AC 27337)

Schaller, Rogers and Lavine, Js.

Argued October 20, 2006—officially released January 23, 2007

*G. Randall Avery*, for the appellants (defendants).

*John M. Spielman*, with whom, on the brief, were *Stacey D. Lafferty* and *Jamie L. Cortina*, legal intern, for the appellee (plaintiff).

*Opinion*

LAVINE, J. The issue in this appeal from the decision of the workers' compensation review board (board) is whether there was sufficient evidence before the workers' compensation commissioner (commissioner) for him to find that the death of the decedent, James DiNuzzo, was causally related to a compensable injury. We conclude that there were insufficient subordinate facts before the commissioner from which he reasonably could make such a finding and, thus, reverse the decision of the board.

On appeal, the defendant Dan Perkins Chevrolet Geo, Inc.,[1] claims that the board improperly affirmed the commissioner's findings because (1) the findings were predicated on expert medical testimony grounded in conjecture, speculation or surmise, (2) the expert medical testimony was not supported by the subordinate facts and (3) the expert testimony was not provided by a qualified or competent medical expert. We agree with the first and second claims, which are interrelated, and, therefore, need not reach the third.

Following the decedent's death, the plaintiff, Evana DiNuzzo, submitted a claim for dependent widow's benefits pursuant to the Workers' Compensation Act (act), General Statutes § 31-275 et seq. See General Statutes § 31-306.[2] The commissioner, after a hearing, made the following relevant findings of fact. The decedent was employed by the defendant and sustained a compensable injury to his cervical spine when he was involved in a motor vehicle accident on June 26, 1997. As a result of the injury, the decedent experienced radiculopathy into his left side and upper extremity. He underwent a three level spinal fusion and foraminectomy. After the surgery, the decedent continued to experience neck pain, left side body pain and paresthesia into his left arm.

Prior to his death on January 12, 2002, the decedent had suffered from injuries and illnesses that were unrelated to his compensable injury. He had chronic bilateral shoulder and low back pain that were the result of a bicycle accident he had in 1974. Since before 1982,

---

[1] Utica Mutual Insurance Company, which provided workers' compensation insurance benefits, also was named a defendant and joined this appeal. For convenience, we refer in this opinion to Dan Perkins Chevrolet Geo, Inc., as the defendant.

[2] General Statutes § 31-306 (a) provides in relevant part: "Compensation shall be paid to dependents on account of death resulting from an accident arising out of and in the course of employment . . . ."

the decedent had been treated for a chronic hepatitis C infection, a result of his intravenous drug use. The decedent was diagnosed with adult onset diabetes in 1995. In 1994 or 1995, he was diagnosed with hypertension and high cholesterol. The decedent's diabetes, hypertension and high cholesterol were controlled by medication. On December 1, 2001, the decedent was hospitalized with complaints of dizziness, diaphoresis and pain. The symptoms were caused by the effect Interferon, a medicine he took to control the hepatitis C infection, had on his blood sugar level.

On the evening of January 11, 2002, the plaintiff observed that the decedent was mumbling and incoherent. He complained that he had severe lower back pain, his stomach was bothering him, and he was constipated. At midnight, the decedent struggled successfully to have a bowel movement, after which he said that he felt better. The plaintiff last saw the decedent at 2 a.m. on January 12, 2002. Because the plaintiff and the decedent slept in separate rooms, the plaintiff was unaware of the decedent's activities between 2 and 8 a.m. when she discovered his body. Members of the Milford police department responded to the plaintiff's call for assistance. The police report indicates that the decedent was declared dead at 8:50 a.m. on January 12, 2002, and that the body was not examined by the medical examiner.

Cosmo Filiberto, a board certified family practitioner and expert in preventive medicine and care, prepared the decedent's death certificate. Filiberto stated that the cause of death was heart disease, secondary to atherosclerotic heart disease. Filiberto had treated the decedent for twenty years and had seen him days before his death but did not examine his body postmortem. No autopsy was performed on the decedent's body. The record is silent as to why no postmortem examination or autopsy was done. Filiberto opined at the hearing

before the commissioner that the decedent's death was brought about by the curtailment of his physical activities. His weight sometimes exceeded 300 pounds. His weight gain and resulting inactivity, along with the heavy doses of narcotics he was required to take to control his pain, made it "medically probable and certain that the stress" of the decedent's compensable injury and its treatment substantially contributed to his death, in Filiberto's view, because they severely limited his ability to maintain his physical fitness and aerobic conditioning. Prior to the decedent's compensable injury, he was able to control his pain due to prior accidents with over-the-counter medication and muscle relaxants. Relief from the pain of the decedent's 1997 accident, however, required high doses of narcotics, eventually reaching 3200 milligrams a day.

Jonathan Alexander, a cardiologist at Danbury Hospital and clinical faculty member of Yale University School of Medicine, testified for the defendant. Alexander based his opinion and report on a review of the decedent's medical records, including Filiberto's records. Alexander found no evidence of atherosclerotic heart disease in the decedent's medical records. Alexander concluded, therefore, that neither the treatment the decedent received as a result of his cervical injury nor his inactivity nor his weight gain were factors in his death.

The commissioner was not persuaded by Alexander's opinions. He found, on the basis of Filiberto's twenty year treatment of the decedent and familiarity with his ongoing medical condition, that there was a relationship between the compensable injury and the decedent's death. He concluded that the plaintiff was entitled to benefits pursuant to § 31-306. The defendant thereafter filed a motion to correct the findings and award, which the commissioner denied in its entirety. The defendant appealed to the board.

The defendant gave eleven reasons for the appeal, which we summarize here: the commissioner improperly found that the decedent's death was causally related to the compensable injury because (1) the plaintiff failed to produce sufficient evidence to rule out nonatherosclerotic heart disease as the cause of death, particularly when the decedent had no history of atherosclerotic heart disease, (2) the decedent's body had not been examined postmortem, (3) there were insufficient underlying facts to support the inferential claim asserted, (4) the medical testimony on which the commissioner relied was not provided by an expert in heart disease and (5) the commissioner disregarded the expert testimony of a cardiologist. The board resolved the appeal by concluding that the weight and credibility of the evidence is to be determined by the trier of fact, in this instance, the commissioner. The board concluded that the commissioner's award was not contrary to law, without evidence or based on unreasonable or impermissible inferences. The board, therefore, affirmed the commissioner's award. The defendant appealed.

Our workers' compensation scheme "indisputably is a remedial statute that should be construed generously to accomplish its purpose. . . . The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for workers' compensation [benefits]." (Citation omitted; internal quotation marks omitted.) *Blakeslee* v. *Platt Bros. & Co.*, 279 Conn. 239, 245, 902 A.2d 620 (2006). "To recover under the Workers' Compensation Act, a plaintiff must prove that the claimed injury is connected causally to the employment by demonstrating that the injury (1) arose out of the employment and (2) occurred in the course of the employment." *Smith* v. *Connecticut Light & Power Co.*, 73 Conn. App. 619, 625, 808 A.2d 1171 (2002). "A commissioner may exercise jurisdiction

to hear a claim only under the precise circumstances and in the manner particularly prescribed by the enabling legislation. . . . The [act] is not triggered by a claimant until he brings himself within its statutory ambit. . . . Although the [act] should be broadly construed to accomplish its humanitarian purpose . . . its remedial purpose cannot transcend its statutorily defined jurisdictional boundaries." (Citation omitted; internal quotation marks omitted.) *Labadie* v. *Norwalk Rehabilitation Services, Inc.*, 84 Conn. App. 220, 228, 853 A.2d 597 (2004), aff'd, 274 Conn. 219, 875 A.2d 485 (2005).

"[T]raditional concepts of proximate cause furnish the appropriate analysis for determining causation in workers' compensation cases. . . . [T]he test for determining whether particular conduct is the proximate cause of an injury [is] whether it was a substantial factor in producing the result." (Citations omitted; internal quotation marks omitted.) *Dixon* v. *United Illuminating Co.*, 57 Conn. App. 51, 60, 748 A.2d 300, cert. denied, 253 Conn. 908, 753 A.2d 940 (2000).

"The commissioner is the sole trier of fact and [t]he conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . On appeal, the board must determine whether there is any evidence in the record to support the commissioner's findings and award. . . . Our scope of review of the actions of the [board] is [similarly] . . . limited. . . . [However] [t]he decision of the [board] must be correct in law, and it must not include facts found without evidence or fail to include material facts which are admitted or undisputed." (Internal quotation marks omitted.) *Sellers* v. *Sellers Garage, Inc.*, 80 Conn. App. 15, 18–19, 832 A.2d 679, cert. denied, 267 Conn. 904, 838 A.2d 210 (2003). "Our

role is to determine whether the review [board's] decision results from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . This standard clearly applies to conflicting expert medical testimony. It [is] the province of the commissioner to accept the evidence which impress[es] him as being credible and the more weighty." (Citation omitted; internal quotation marks omitted.) *O'Reilly* v. *General Dynamics Corp.*, 52 Conn. App. 813, 816, 728 A.2d 527 (1999).

"As long as it is clear that the expert's opinion was based on more than mere conjecture, the entire substance of the expert's testimony should be examined." Id., 817. "[E]xpert opinions must be based on reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. An expert's testimony as to the reasonable probability of the occurrence of an event does not depend on semantics or the use of any particular term or phrase, but rather, is determined by looking at the entire substance of the testimony." (Citation omitted.) Id., 817–18. "The [commissioner] alone is charged with the duty of initially selecting the inference which seems most reasonable and his choice, if otherwise sustainable, may not be disturbed by a reviewing court. . . . Inferences may only be drawn from competent evidence. Competent evidence does not mean any evidence at all. It means evidence on which the trier properly can rely and from which it may draw reasonable inferences." (Citation omitted; internal quotation marks omitted.) *Dengler* v. *Special Attention Health Services, Inc.*, 62 Conn. App. 440, 451, 774 A.2d 992 (2001).

In this case, the commissioner credited the testimony of Filiberto, the plaintiff's personal physician. We accept the commissioner's credibility determination for

purposes of our analysis, but the testimony of even the most persuasive expert witness cannot be credited if it is not based on facts. The determinative question, therefore, is not whether Filiberto was credible but whether there are sufficient subordinate facts in the record to support his opinion that the decedent's death was causally related to his compensable injury. On the basis of our review of Filiberto's testimony, we conclude that there are not and that Filiberto's opinion was grounded in speculation or conjecture. See *O'Reilly* v. *General Dynamics Corp.*, supra, 52 Conn. App. 817.

Filiberto testified before the commissioner on May 5, 2004, and a copy of his deposition testimony was placed into evidence. Our review of the transcripts reveals that the decedent was morbidly obese in 1982 and that he gained twenty to thirty pounds after the 1997 accident and thirty to thirty-five more pounds after his cervical fusion. Due to the decedent's weight and the drugs he took to control his pain, Filiberto opined that the decedent was unable to exercise and that he would have lived longer had he exercised. According to Filiberto, the decedent died of a heart attack caused by atherosclerotic disease, although he never ordered tests to determine whether the decedent, in fact, had atherosclerotic heart disease.[3] Filiberto also opined that Oxycontin, which the decedent was taking for pain, can cause constipation. According to Filiberto, straining to have a bowel movement can cause changes in the body's system that can produce cardiac arrest.

Filiberto also testified that he did not examine the decedent's body subsequent to its being found and that no autopsy had been performed. Filiberto did not know whether the decedent had a congenital heart defect that could have caused a heart attack and acknowledged

---

[3] A thorough review of the record disclosed no evidence, other than Filiberto's opinion testimony, that the decedent had atherosclerotic heart disease.

that a ruptured aneurysm, pulmonary embolism, stroke or sudden arrhythmia can cause sudden death.[4] He conceded that, without an autopsy, there is no way to know the exact cause of the decedent's death.

On cross-examination before the commissioner, the defendant's counsel presented Filiberto with a copy of the decedent's January 11, 2002 Milford Hospital records, which he previously had not seen.[5] A gastroenterologist was treating the decedent's chronic hepatitis C infection, and Filiberto was unaware that the decedent had commenced taking Interferon. Filiberto conceded that the symptoms the decedent complained of

[4] Filiberto testified, in part, on cross-examination, as follows:

"[The Defendant's Counsel]: Doctor, just so your testimony is clear, whenever there is reference, in any record or [in] anything that you have said, to a heart attack, you don't actually know whether there was a heart attack that precipitated the death, as opposed to some other event, such as a stroke or brain embolism or an aortic burst or something like that?

"[The Witness]: That's true."

[5] Filiberto testified, in part, on cross-examination at the hearing as follows:

"[The Defendant's Counsel]: Doctor, the questions asked by the commissioner bring me to ask you questions about the treatment at Milford Hospital of your patient, [the decedent on] . . . December 1, 2001. Are you familiar with that care?

"[The Witness]: No.

"[The Defendant's Counsel]: Have you seen the records with regard to the care?

"[The Witness]: No.

＊ ＊ ＊

"[The Defendant's Counsel]: Now that [the Milford Hospital record] has been marked as a full exhibit, I just want you to reiterate a couple of things. First, prior to giving your opinions in this case, you did not know that [the decedent] had been a patient at Milford Hospital on December 1, 2001?

"[The Witness]: No.

"[The Defendant's Counsel]: Now, you see there's reference to a word ataxia. Can you tell us what ataxia means?

"[The Witness]: Unsteady when you are walking. Wobbly walking.

"[The Defendant's Counsel]: In fact, they performed, apparently at the hospital at this time a CAT [computerized axial tomography] scan of the brain, is that correct?

"[The Witness]: Correct.

"[The Defendant's Counsel]: And they said they were doing so for what symptom complaints?

on January 11, 2002, could have resulted from taking Interferon. See footnote 5. The reality is that it was not possible to determine with any reasonable degree of probability the cause of the decedent's death given the factual gaps in the record. On the basis of our examination of Filiberto's testimony and opinion, we conclude that there were insufficient subordinate facts to support his opinion that the decedent's death was causally related to the compensable injury or to remove the cause of death from the realm of conjecture.[6] See

"[The Witness]: For ataxia, disorientation. . . . Sure. I'll read the whole paragraph [of the Milford Hospital record]. 'I discussed the case with [a gastroenterologist]. He states side affects of hypertension, sweating and dizziness expected for five days after Interferon. . . .

"[The Defendant's Counsel]: In fact, you do not have records showing when your patient was administered Interferon, do you?

"[The Witness]: No. . . .

"[The Defendant's Counsel]: Now that you have seen [the Milford Hospital records], is it also a possibility that some of the symptom complaints that [the plaintiff] testified about on that night could have been as a result of some side effect of his Interferon treatment?

"[The Witness]: If he had gotten it close to that time frame. The doctor there said four days.

"[The Defendant's Counsel]: You don't know when he last might have had any Interferon treatment prior to his death?

"[The Witness]: That's right."

[6] The plaintiff has argued that the testimony of the defendant's medical expert, Alexander, provided the necessary evidence to establish a causal connection between the decedent's compensable injury and his death. We disagree.

During his deposition, Alexander testified on cross-examination by the plaintiff's counsel:

"[The Plaintiff's Counsel]: Well, let me ask you: In your opinion, if someone dies suddenly, would you presume that that was a cardiac event?

"[The Witness]: Yes.

"[The Plaintiff's Counsel]: Why is that?

"[The Witness]: Sudden death is not slow death, and there are several organ systems that can fail that can cause one to die suddenly within a matter of minutes, seconds or minutes. And one of those organic systems is the heart. Again, without a witnessed death . . . nobody saw him die; they found him dead, and, without an autopsy, you cannot come to a conclusion as to the cause of this man's death. It's certainly *possible* it's cardiac, but, as we stated earlier, there are other things that could have caused him to die." (Emphasis added.)

*Aspiazu* v. *Orgera,* 205 Conn. 623, 632, 535 A.2d 338 (1987) (expert opinion cannot be based on conjecture or surmise but must be reasonably probable). We therefore reverse the board's decision.

The decision of the workers' compensation review board is reversed and the case is remanded to the board with direction to sustain the defendant's appeal.

In this opinion the other judges concurred.

---

Alexander testified that it was *possible* for the decedent to have died as the result of a cardiac event. *Possibilities* do not provide a sufficient basis for establishing a causal relationship. "[E]xpert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture . . . . To be reasonably probable, a conclusion must be more likely than not." (Internal quotation marks omitted.) *Card* v. *State,* 57 Conn. App. 134, 138–39, 747 A.2d 32 (2000).