# JANEL J. JONES *v.* CONNECTICUT CHILDREN'S MEDICAL CENTER FACULTY PRACTICE PLAN
## (AC 32486)

DiPentima, C. J., and Bear and Espinosa, Js.

Argued May 20—officially released September 13, 2011

*John D. Palermo*, for the appellant (plaintiff).

*Colette S. Griffin*, with whom was *Melissa A. Federico*, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiff, Janel J. Jones, appeals from the decision of the workers' compensation review board (board) reversing the decision of the workers' compensation commissioner for the first district (commissioner). On appeal, the plaintiff claims that the board improperly (1) concluded there was insufficient evidence to support the finding that the plaintiff's work-related motor vehicle accident was a substantial factor in the development of her psychiatric injury and impairment and (2) permitted the defendant Connecticut Children's Medical Center Faculty Practice Plan (employer) to contest the compensability of her injuries and disability rating.[1] We disagree and, accordingly, affirm the decision of the board.

The following history is necessary for the resolution of this appeal. The plaintiff is an advanced practice

---

[1] Webster Risk Services, Inc., was also a party in the proceedings before the commissioner and the board but has not participated in this appeal.

registered nurse[2] who began working for the employer in December, 2002. The plaintiff's work duties included basic management and human resource functions and clinical supervision of mid-level and administrative staff. On February 27, 2006, the plaintiff, as part of her employment, traveled from a medical office in Windsor to one located in Bloomfield. During this trip, the rear tire of a truck driving in front of the plaintiff fell off and crashed onto the roof of her motor vehicle. As a result, the plaintiff pulled off to the side of the road.

A police officer drove the plaintiff home. Later that day, after she developed a headache, neck and shoulder soreness, and nausea, the plaintiff received treatment from the emergency department at the University of Connecticut (emergency department), where she was diagnosed with "cervical/thoracic strain, with complaints of right-sided headache and upper back pain/ neck pain." At this time, neither the physician at the emergency department nor the plaintiff believed that she had hit her head in the accident. The plaintiff again received a medical examination in the emergency department on March 3, 2006, and the records indicate a "normal exam."

Following medical advice, the plaintiff consulted Sarah Dainiak, a physician, and shortly thereafter began a course of physical therapy. On March 28, 2006, the plaintiff again went to the emergency department, complaining of worsening headaches, constant dizziness and nausea, blurred vision and photosensitivity. At this time, she was diagnosed with post-concussive syndrome and instructed to see a neurologist. A computed tomography scan (CT scan) of her neck and cervical

[2] Section 17b-262-830 (1) of the Regulations of Connecticut State Agencies provides: "Advanced practice registered nurse or APRN means an advanced practice registered nurse as defined in section 20-87a of the Connecticut General Statutes . . . ." (Internal quotation marks omitted.) See also General Statutes § 20-87a (b).

magnetic resonance imaging also were conducted, the results of which were normal.

At the request of her employer, the plaintiff saw Pietro A. Memmo, a physician. The plaintiff indicated that she suffered a loss of consciousness and some memory loss at the accident scene. Memmo suspected a "closed head injury" and recommended that she consult with a neurologist. That same day, the plaintiff was seen at the Hartford Hospital emergency department and received treatment from Isaac Silverman. After learning that the result of the plaintiff's CT scan of her head and brain were normal, Silverman diagnosed the plaintiff with typical post-concussive syndrome and concurrent anxiety. Later, the plaintiff was treated by an ear, nose and throat (ENT) specialist to evaluate her complaints of aural pressure, dizziness, nausea, blurry vision, otalgia and bilateral tinnitus.[3] In recounting her history, the plaintiff stated that she had lost consciousness for a minute or two following her accident. The ENT tests were normal. At some point, the plaintiff, fearing that she was having a stroke, went to the emergency department at St. Francis Hospital. An angiography[4] was performed and the results were normal. The plaintiff also saw Marlene A. Murphy-Setzko, a urologist, who diagnosed the plaintiff with a neurogenic bladder[5] and prescribed her medication to treat the urinary symptoms.

In June, 2006, the parties entered into a voluntary agreement. The employer accepted a claim for injury

---

[3] "Otalgia" is a medical term for an earache. See Stedman's Medical Dictionary (28th Ed. 2006) p. 1394. "Tinnitus" is defined as "[p]erception of a sound in the absence of an environmental acoustic stimulus. The sound can be a pure tone or noise including (ringing, whistling, hissing, roaring, or booming) in the ears." Stedman's Medical Dictionary (28th Ed. 2006) p. 1992.

[4] "Angiography" is defined as "[r]adiography of vessels after the injection of a radiopaque contrast material; usually requires percutaneous insertion of a radiopaque catheter and positioning under fluoroscopic control." Stedman's Medical Dictionary (28th Ed. 2006) p. 86.

[5] Murphy-Setzko defined "neurogenic bladder" as "a bladder that's been affected by a neurologic insult or injury."

as a result of the motor vehicle accident. The body parts listed as injured were as follows: "Concussion, Cervical, Thoracic and Lumbar Strain."

On July 17, 2006, Robert H. Berland, a physician, performed an independent medical examination of the plaintiff. Berland indicated that "although there appeared to be a direct relationship between the [plaintiff's] injury and her symptoms, anxiety also played a role in precipitating many of her symptoms." The plaintiff subsequently saw John A. Crouch, a neuropsychologist, who indicated that the plaintiff "reportedly sustained a traumatic brain injury" and recommended "aggressive mental health treatment . . . ." In February and May of 2007, Kimberlee J. Sass, a neuropsychologist, examined the plaintiff and determined that it was unlikely that she lost consciousness or was amnesic for even a brief period of time. Sass further opined that the plaintiff would not reach maximum medical improvement unless she underwent psychological treatment and that "the primary neuropsychological impediment to [the plaintiff's] return to employment is the disruption of the family system that had existed prior to [the accident]."

Peter Wade, a neurologist, determined, contrary to some of the physicians who had examined the plaintiff, that there was a period of amnesia and confusion consistent with the plaintiff having sustained a concussion. He further indicated that the plaintiff had sustained a 10 percent permanent partial disability to her brain and that she had reached maximum medical improvement. He concluded that the plaintiff currently was not capable of gainful employment, was not a candidate for retraining and her ability to return to work was "nonexistent."

In December, 2007, James O. Donaldson, a neurologist, conducted another independent medical examination. Donaldson opined that the plaintiff did not lose

consciousness, suffer a concussion or post-concussive syndrome or a traumatic brain injury, but did experience some strain and muscle spasms. Donaldson further concluded that the plaintiff's bladder condition was not related to the accident, and that the "most likely cause of . . . the symptoms was psychological distress which is unrelated to the motor vehicle accident."

In March, 2008, the plaintiff saw Walter A. Borden, a psychiatrist. He diagnosed the plaintiff as suffering from a somatization disorder associated with her underlying depression and anxiety. He believed that the plaintiff did not suffer from a traumatic brain injury or posttraumatic stress disorder and that her issues originate from anxiety and depression that predated the motor vehicle accident.

The commissioner, charged with the arduous task of reconciling the various contradictory medical opinions, found that there was insufficient evidence to support a finding that the plaintiff "had experienced a loss of consciousness, an altered state of mind, or an amnesic period during the motor vehicle accident of February 27, 2006." The commissioner further determined that the plaintiff had provided the various medical providers with inconsistent histories. As a further result of these inconsistent histories, the commissioner discredited the diagnoses of post-concussive syndrome or posttraumatic stress disorder. He also specifically discredited the opinion of Wade with respect to post-concussive syndrome and work capacity. The commissioner also noted the lack of objective evidence from the various medical tests that had been performed on the plaintiff. The commissioner then found: "[T]he only issues keeping the [plaintiff] from returning to full-duty work in her prior position are emotional and psychological. . . . Other than [these] issues . . . she has a full-duty work capacity."

The commissioner also made the following findings: "Most of the physicians involved in this case (including Crouch, Sass, Donaldson, and Wade) have concluded that the [plaintiff] has significant emotional and psychological issues and the [physicians] vary only in their opinions as to causation. There are, obviously, significant underlying emotional and psychological issues unrelated to the motor vehicle accident. *However, the fact remains that the [plaintiff] had no problem performing her work duties prior to the accident on February 27, 2006. Therefore, the accident was a substantial factor in her subsequent emotional and psychological sequelae.*"[6] (Emphasis added.) Additionally, the commissioner found Murphy-Setzko's opinions regarding the causation of the plaintiff's neurogenic bladder to be persuasive. Ultimately, the commissioner concluded that the plaintiff sustained a 10 percent permanent partial disability of her brain as a result of the motor vehicle accident and determined that her employer would not be liable for prospective indemnity benefits until she complied with the treatment plan set forth by Crouch.

The employer unsuccessfully moved to correct certain findings made by the commissioner and then filed an appeal to the board. The employer first challenged the commissioner's finding that the motor vehicle accident was a substantial factor in the development of the plaintiff's psychological issues. The board stated that it was "unable to discern from the evidentiary record a medical basis for the trier's conclusion that the motor vehicle accident was a substantial contributing factor in the development of the [plaintiff's] subsequent psychological issues . . . ." The board also rejected the commissioner's findings with respect to the plaintiff's neurogenic bladder, reasoning that Murphy-Setzko's diagnosis was predicated largely on her understanding

---

[6] "Sequelae" is defined as a "condition following as a consequence of a disease." Stedman's Medical Dictionary (28th Ed. 2006) p. 1752.

of the diagnosis from Wade as conveyed to her by the plaintiff.

Turning to the issue of whether the finding of the 10 percent permanent partial disability of the brain was improper, the board noted that the commissioner had taken administrative notice of an agreement, approved on June 26, 2006, indicating a concussion as "an accepted body part." The board also observed that although the employer had issued a voluntary agreement awarding the plaintiff a 10 percent permanent partial disability rating of the brain with a maximum improvement as of April 29, 2007, the plaintiff had failed to execute it. The board could not discern the rationale for this order given the commissioner's rejection of Wade's diagnosis of post-concussive syndrome and his opinion of the plaintiff's work capacity. It concluded that, given the commissioner's findings as to Wade, the agreement was moot. Finally, it declined to construe the agreement as a judicial admission. Accordingly, the board reversed the decision of the commissioner. This appeal followed. Additional facts will be set forth as necessary.

We begin by setting forth the general legal principles behind the workers' compensation statutory scheme. "The purpose of the [workers'] compensation statute is to compensate the worker for injuries arising out of and in the course of employment, without regard to fault, by imposing a form of strict liability on the employer . . . . The Workers' Compensation Act [(act), General Statutes § 31-275 et seq.] compromise[s] an employee's right to a common law tort action for work related injuries in return for relatively quick and certain compensation. . . . The act indisputably is a remedial statute that should be construed generously to accomplish its purpose. . . . The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for

workers' compensation. . . . Further, our Supreme Court has recognized that the state of Connecticut has an interest in compensating injured employees to the fullest extent possible . . . ." (Citations omitted; internal quotation marks omitted.) *Healey* v. *Hawkeye Construction, LLC*, 124 Conn. App. 215, 219–20, 4 A.3d 858 (2010), cert. granted on other grounds, 299 Conn. 927, 12 A.3d 570 (2011); see also *Deschenes* v. *Transco, Inc.*, 288 Conn. 303, 314–15, 953 A.2d 13 (2008); *Roy* v. *Bachmann*, 121 Conn. App. 220, 224, 994 A.2d 676 (2010) (purpose of statutes is to compensate workers for work-related injuries without regard to fault by imposing strict liability on employer). In order to recover pursuant to this act, "a plaintiff must prove that the claimed injury is connected causally to the employment by demonstrating that the injury (1) arose out of the employment and (2) occurred in the course of the employment." (Internal quotation marks omitted.) *McFarland* v. *Dept. of Developmental Services*, 115 Conn. App. 306, 310, 971 A.2d 853, cert. denied, 293 Conn. 919, 979 A.2d 490 (2009).

I

The plaintiff first claims that the board improperly concluded that there was insufficient evidence in the record to support the finding that the plaintiff's work-related motor vehicle accident was a substantial factor in the development of her psychiatric injury and impairment. Specifically, she argues that (1) the opinions of Sass and Wade support the commissioner's finding that the accident was causally connected to the subsequent psychiatric sequelae and (2) there was sufficient evidence that her neurogenic bladder was a result of the accident. We disagree.

"The principles that govern our standard of review in workers' compensation appeals are well established. . . . The board sits as an appellate tribunal reviewing

the decision of the commissioner. . . . [T]he review [board's] hearing of an appeal from the commissioner is not a de novo hearing of the facts. . . . [T]he power and duty of determining the facts rests on the commissioner . . . . [T]he commissioner is the sole arbiter of the weight of the evidence and the credibility of witnesses . . . . Where the subordinate facts allow for diverse inferences, the commissioner's selection of the inference to be drawn must stand unless it is based on an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . .

"This court's review of decisions of the board is similarly limited. . . . The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . [W]e must interpret [the commissioner's finding] with the goal of sustaining that conclusion in light of all of the other supporting evidence. . . . Once the commissioner makes a factual finding, [we are] bound by that finding if there is evidence in the record to support it." (Citations omitted; internal quotation marks omitted.) *Williams* v. *State,* 124 Conn. App. 759, 763–64, 7 A.3d 385 (2010); see also *Marandino* v. *Prometheus Pharmacy,* 294 Conn. 564, 572, 986 A.2d 1023 (2010); *Cervero* v. *Mory's Assn., Inc.,* 122 Conn. App. 82, 89–90, 996 A.2d 1247, cert. denied, 298 Conn. 908, 3 A.3d 68 (2010).

The employer claims that the record does not support the commissioner's conclusion that because the plaintiff was able to perform her work duties prior to the February 27, 2006 accident, that event was a substantial factor in her subsequent emotional and psychological issues. The plaintiff argues that Wade[7] and Crouch

[7] As we previously have discussed, the commissioner expressly discredited Wade's opinions on the basis of the flawed medical history that he had received from the plaintiff. Accordingly, we disagree with the plaintiff's

determined that her psychological issues were caused by the accident and that Berland[8] concluded that the motor vehicle accident was directly related to her subsequent symptoms. She also contends that Sass concluded that the plaintiff's condition was caused by the disruption in her family life as a result of the accident. The plaintiff maintains that this evidence supports the commissioner's ultimate conclusion that her symptoms were causally related to the accident.

"[I]n Connecticut traditional concepts of proximate cause constitute the rule for determining . . . causation [in workers' compensation cases]. . . . [T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. . . . Further, it is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendant's conduct]. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. . . . This causal connection must be based [on] more than conjecture and surmise. . . . An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm. . . . The finding of actual cause is thus a requisite for any finding of proximate cause. . . .

---

statement that Wade's opinion supported the commissioner's finding. We further conclude that as a result of this finding, the board properly concluded that there was no evidence to support the award of a 10 percent permanent partial disability to the plaintiff's brain.

[8] Berland's report set forth his diagnosis as follows: "The [plaintiff] appears to have sustained a head and neck injury in a motor vehicle accident and now has persistent post-traumatic symptoms." He further opined that there "seem[ed] to be a direct relationship between her injury and her symptoms." The commissioner, however, specifically found that there was insufficient evidence to support such a diagnosis. We also note that aside from the assertion regarding Berland, the plaintiff's brief does not address his report in detail.

"Unless the medical testimony by itself establishes a causal relation, or unless it establishes a causal relation when it is considered along with other evidence, the commissioner cannot reasonably conclude that the [injury] is causally related to the employee's employment. . . . Expert opinions must be based [on] reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend [on] the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." (Citations omitted; internal quotation marks omitted.) *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, 294 Conn. 132, 141–43, 982 A.2d 157 (2009).

The commissioner specifically found that the plaintiff provided the various physicians with inconsistent histories regarding her motor vehicle accident and that the credibility and persuasiveness of each physician was "directly related" to the accuracy of the history given by the plaintiff. The commissioner also expressly found that the plaintiff presented "significant underlying emotional and psychological issues unrelated to the motor vehicle accident." Additionally, there is a finding that there was no persuasive, objective evidence to show that the plaintiff suffered from any soft tissue, skeletal, or neurological issues.

The plaintiff argues that Sass' report provides the necessary evidence to support the commissioner's finding that the accident was a substantial factor in her subsequent emotional and psychological sequelae. Specifically, Sass' report states: "Injury incurred during physical therapy, emotional distress, and longstanding features of this patient's personality were likely to have

been other causes of her symptoms. Her course was relatively benign until her neck was strained in physical therapy. . . . [The plaintiff's] history is consistent with the conclusions that [she] incurred no clinically significant brain injury on 27 February [2006]. She incurred an injury during physical therapy on 27 March. That led to increased pain, the onset of severe negative emotions and a breakdown of thought processes. The nature of the injury that [the plaintiff] incurred during physical therapy and its sequelae, if any, are not within my expertise to identify, evaluate or quantify. However, psychological factors that contributed to her reaction to that injury, the nature of her current emotional difficulties, and the status of her current cognitive functioning are issues that I can address."

Sass further noted that the plaintiff exhibited a long-standing quality of emotional robustness that was in fact a "manifestation of denial and dependence" and that she minimized and denied problems to maintain an appearance of confidence and competence. According to Sass, the plaintiff successfully had adapted to these features of her personality as evidenced by attaining a graduate education and a successful marriage. This success was based on her relationship with her husband, whose confidence in her led her to be confident in herself. Following the motor vehicle accident, the concerns of the plaintiff's husband regarding her functioning "eroded" her confidence and this situation continued to the time of Sass' report. Sass concluded: "[The actions of the plaintiff's husband], however well intended, have undermined her recovery."[9] As a result, the plaintiff viewed herself as "substantially compromised and disabled."

---

[9] Sass discussed several instances where the actions of the plaintiff's husband negatively impacted the plaintiff's recovery. For example, after the plaintiff expressed an interest in working as a nurse consultant by telephone, he dissuaded her by mentioning her lapses in concentration. Similarly, during the first session with Sass, the plaintiff returned from a lunch break in tears after her husband reminded her of the "difficulties" she experienced.

After carefully reviewing the record, we agree with the board's conclusion that there is no evidence to support the commissioner's conclusion that the accident was a substantial factor[10] in the plaintiff's subsequent emotional and psychological sequelae. While Sass' report notes that the disruption to the plaintiff's family system is the primary impediment to her return to employment, it fails to establish the required causal link between the accident and the plaintiff's symptoms. Contrary to the arguments of the plaintiff, it appears that Sass determined that the actions of the plaintiff's husband following a physical therapy injury, and not the motor vehicle accident, caused her subsequent emotional and psychological sequelae.

The plaintiff also relies on the January 16, 2007 report of Crouch, a neuropsychologist who examined her following a referral from Wade. The report states at the outset: "In [the motor vehicle accident the plaintiff] reportedly sustained a traumatic brain injury (TBI). The current assessment was ordered to determine her current cognitive strengths/weaknesses and emotional status." After setting forth the results of the testing and examination of the plaintiff, Crouch wrote: "Regarding

---

It must be noted that Sass also indicated that "[a]fter interviewing [the plaintiff's husband], I formed the impression that he was not deliberately undermining [the plaintiff's] recovery. To the contrary, he acted out of concern and with a genuine intent to do what was in her best interest."

[10] We note that the commissioner appears to have applied a causation in fact standard, that is, because the plaintiff had no problems before the accident, and developed emotional and psychological sequelae after, the two events are related. See, e.g., *Vaillancourt* v. *Latifi*, 81 Conn. App. 541, 546, 840 A.2d 1209 (2004) (causation in fact is purest legal application of legal cause where test is would injury have occurred were it not for initial event). This is not the correct standard under our law. Our workers' compensation jurisprudence requires the application of the proximate cause standard. See *Labadie* v. *Norwalk Rehabilitation Services, Inc.*, 274 Conn. 219, 237–38, 875 A.2d 485 (2005); *Voronuk* v. *Electric Boat Corp.*, 118 Conn. App. 248, 253, 982 A.2d 650 (2009); *Hummel* v. *Marten Transport, Ltd.*, 114 Conn. App. 822, 844, 970 A.2d 834, cert. denied, 293 Conn. 907, 978 A.2d 1109 (2009).

causality, given [the plaintiff's] unremarkable history, the most likely cause of her functional issues is the [February 27, 2006 motor vehicle accident]. Within a reasonable degree of neuropsychological probability, the most likely explanation of these deficits is a Mild TBI sustained in the [February 27, 2006] incident. Although further improvement could occur in her functioning given the amount of time since the incident, future capability for employment is unclear. Although she tends to deny the presence of emotional/psychological difficulties, there is evidence of irritability, depression, and somatic preoccupation. Such issues appear to be causing stress in her family, although supports remain good. These issues, as well as her physical problems (e.g., pain) could also impact her cognition and are likely secondary to the [February 27, 2006] accident."

As noted previously, the commissioner expressly found that the credibility and persuasiveness of each medical provider in this case is directly related to the accuracy of the history given to them by the plaintiff. The commissioner also found that there was insufficient evidence to support a finding that the plaintiff suffered a loss of consciousness, an altered state of mind or amnestic period, a concussion, post-traumatic stress disorder or post-concussion syndrome. Crouch's report fails to provide the required evidentiary support for the commissioner's finding that the accident was a substantial factor in the plaintiff's subsequent emotional and psychological sequelae. His report states that a mild traumatic brain injury caused the plaintiff's issues; however, the commissioner expressly found insufficient evidence to support such an event. Further, Crouch's report appears to rely on the plaintiff or Wade for the fact that a traumatic brain injury occurred. Again, the commissioner found that neither the plaintiff nor Wade was credible with respect to the events of the motor

vehicle accident. We therefore are not persuaded by this argument.

The plaintiff next argues that sufficient evidence exists in the record to support the commissioner's finding that she suffered from a neurogenic bladder caused by the motor vehicle accident. Specifically, the plaintiff argues that the board improperly disregarded the deposition testimony of Murphy-Setzko. We disagree.

The plaintiff saw Murphy-Setzko on October 20, 2006, for two issues: "A chronic feeling of urgency and urge incontinence, including nocturnal uresis, which the [plaintiff] denied having prior to the accident [and] [f]acial flushing and tingling in the [plaintiff's] face as a warning that she needed to void. She had loss of normal cues in the pelvis with the need to void." Murphy-Setzko testified at her deposition that the plaintiff suffered from a neurogenic bladder and that the motor vehicle accident was the cause of these symptoms. The commissioner found that Murphy-Setzko was credible on her opinion on causation.

The board, in reversing the commissioner's findings regarding the issue of the neurogenic bladder, noted that Murphy-Setzko defined this term as "a bladder that's been affected by a neurologic insult or injury." Murphy-Setzko conceded that she had not reviewed Wade's records and assumed that he had referred the plaintiff to her because of a head injury. Murphy-Setzko also acknowledged during cross-examination that her diagnosis was predicated largely on her understanding of Wade's diagnosis as conveyed by the plaintiff. Finally, Murphy-Setzko indicated that she "could not formulate an opinion based on a reasonable degree of medical certainty without reviewing the [plaintiff's] other medical records."

The board then concluded: "The foregoing indicates quite clearly that . . . Murphy-Setzko's diagnosis was

primarily derived from her assumption, based in part on her prior working relationship with . . . Wade and in part on the history of the motor vehicle accident given to her by the [plaintiff], that the [plaintiff] had sustained a head injury in the accident. The record does indicate that . . . Wade in fact believed the [plaintiff] has sustained a concussion and was suffering from post-concussive syndrome. Had the . . . commissioner found . . . Wade's opinion persuasive, it might have been possible to uphold the trier's finding relative to the credibility of . . . Murphy-Setzko regarding the causation of the [plaintiff's] neurogenic bladder. However, the . . . commissioner ultimately determined . . . Wade's opinion was not persuasive and, further, that the evidentiary record was insufficient to determine that the [plaintiff] suffered from a concussion, post-concussive syndrome, or any other neurological deficits. As such, *given the degree to which . . . Murphy-Setzko's opinion was demonstrably dependent upon . . . Wade's diagnosis, we are unable to affirm the . . . commissioner's finding that . . . Murphy-Setzko was credible relative to her conclusion that the [plaintiff] developed a neurogenic bladder as a result of the motor vehicle accident."* (Emphasis added.)

After reviewing the record, we agree with the conclusion of the board that the commissioner's finding regarding the medical opinion of Murphy-Setzko cannot stand in light of the commissioner's other findings, particularly those relating to Wade. Murphy-Setkzo specifically indicated that she relied on the history provided by the plaintiff. She did not review the emergency department records or the independent medical examinations of the plaintiff. As noted, she did not review Wade's treatment records of the plaintiff, but she acknowledged that her diagnosis was based on his diagnosis of a neurologic trauma. She also conceded that if a neurologist found that there was no head trauma

type injury with no neurological deficit, then she would need to take that into consideration with respect to her opinion. Further, Murphy-Setzko noted that her conclusions would be subject to change if information from the plaintiff later was revealed to be inaccurate. Last, she agreed to the following question posed by counsel: "And it would also be fair to say that you really can't formulate an opinion, based on a reasonable degree of medical certainty, without reviewing records other than what you understand to be the case, because you haven't reviewed those actual records?" On the basis of the foregoing, we conclude that Murphy-Setzko's opinion is not based on reasonable probabilities but on mere speculation and conjecture. See *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, supra, 294 Conn. 142.

II

The plaintiff next claims that the board improperly permitted the employer to contest the compensability of her injuries and disability rating. Specifically, she argues that because the employer entered into an agreement that the plaintiff suffered, inter alia, a concussion and subsequently proposed an agreement with a 10 percent permanent partial disability rating issued by Wade, it was precluded from later challenging the causal connection.[11]

We decline to review this claim for two reasons. First, the plaintiff failed to raise this issue before either the commissioner or the board.[12] As a general matter, we do not decide issues raised for the first time on appeal. See *Donaldson* v. *Continuum of Care, Inc.*, 94 Conn.

[11] We note again that, although the parties entered into an agreement in June, 2006, the plaintiff failed to accept the agreements offered by the employer regarding the maximum medical improvement and 10 percent permanent partial disability rating of the plaintiff's brain.

[12] Although both the commissioner and the board briefly mention the June, 2006 agreement in their respective decisions, the specific issue of preclusion was not raised by the plaintiff during the proceedings below.

App. 334, 340, 892 A.2d 332 (2006), cert. denied, 282 Conn. 921, 925 A.2d 1103 (2007); *Rinaldi* v. *Enfield*, 82 Conn. App. 505, 517, 844 A.2d 949 (2004). Second, "[o]ur rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.) *American Progressive Life & Health Ins. Co. of New York* v. *Better Benefits, LLC*, 292 Conn. 111, 122, 971 A.2d 17 (2009); see also *Rinaldi* v. *Enfield*, supra, 517. During the proceedings before the commissioner and the board, the plaintiff failed to argue that the employer was precluded from contesting the issues of the concussion or the 10 percent disability rating. Were we to consider the plaintiff's claim at this juncture, we would be endorsing her tactic of utilizing one strategy at trial and a different one on appeal. See *Falkenstein* v. *Falkenstein*, 84 Conn. App. 495, 505, 854 A.2d 749 ("[t]o allow [a party] to seek reversal now that [her] trial strategy has failed would amount to allowing [her] to induce potentially harmful error, and then ambush [the trial court] with that claim on appeal" [internal quotation marks omitted]), cert. denied, 271 Conn. 928, 859 A.2d 581 (2004). For these reasons, we decline to review this claim.

The decision is affirmed.

In this opinion the other judges concurred.